NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4159
_____

QUADRANT EPP USA, INC.; QUADRANT PHS, INC.,

Appellants

v.

MENASHA CORPORATION
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 06-cv-00356)
District Judge:  Honorable Lawrence F. Stengel
_____

Submitted Under Third Circuit LAR 34.1(a)
September 20, 2011

Before:  FISHER, HARDIMAN and GREENAWAY, JR., *Circuit Judges*.

(Filed: September 21, 2011)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

    Quadrant EPP USA, Inc. and Quadrant PHS, Ins. (collectively, Quadrant) appeal a

judgment in favor of Menasha Corporation following a bench trial.  We will affirm.

I

Because we write for the parties, who are well acquainted with the case, we recount only the facts essential to our decision.

This dispute arose out of a stock purchase agreement (Agreement) pursuant to which Quadrant purchased four Poly Hi plastics manufacturing facilities from Menasha for approximately $84.5 million. As is typical with such agreements, the seller (Menasha) made certain environmental warranties to the purchaser (Quadrant). In conjunction with those warranties, Menasha agreed to indemnify Quadrant from losses arising out of environmental conditions extant at the time of closing. Menasha's duty to indemnify Quadrant was triggered only when "the aggregate amount of Losses incurred or suffered by [Quadrant] from all such breaches and inaccuracies . . . exceeds One Million Dollars ($1,000,000.00)." The Agreement's definition of "Losses" included prejudgment interest and "reasonable attorneys' fees and expenses."

After the Agreement was signed but before the deal closed, Menasha and Quadrant were aware—from inspections conducted by both the Occupational Safety and Health Administration (OSHA) and Menasha itself—that the Keyser Valley Poly Hi facility had accumulated sufficient dust to present a combustion hazard. A few days before closing, Menasha forwarded a supplemental disclosure to Quadrant explaining that an OSHA inspector who had visited the Keyser Valley facility for unrelated reasons had found a lack of compliance with the National Fire Protection Association's NFPA 654,

2

STANDARD FOR THE PREVENTION OF FIRE AND DUST EXPLOSIONS FROM THE MANUFACTURING, PROCESSING, AND HANDLING OF COMBUSTIBLE PARTICULATE SOLIDS (2000 ed.) (NFPA 654), and suggested certain housekeeping measures to mitigate the risk. This disclosure also noted that Menasha had hired an industrial cleaning firm to remove dust from the Keyser Valley facility and that some additional mitigation would likely be required. Finally, the disclosure represented that Menasha had not been notified of an OSHA violation. Quadrant replied to Menasha's disclosure by stating that it considered the supplemental disclosure informational and that it did not alter the warranties and indemnifications in the Agreement. The closing went forward on August 2 and 3, 2005.

Two days after the closing, Quadrant retained the services of John P. Cholin, a professional engineer specializing in fire protection. Cholin inspected the Keyser Valley facility on August 11, 2005, and determined that the concerns expressed by the OSHA inspector were valid. Accordingly, Quadrant asked Cholin to determine the cost of bringing the facility into compliance with the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq*. (Act).

On August 29, 2005, OSHA issued a citation and notification of penalty, informing Quadrant that the Keyser Valley facility violated the Act's general duty clause. 29 U.S.C. § 654(a)(1). The citation also noted that complying with the NFPA 654 was, "among other methods, one feasible and useful method to correct this hazard." On

3

September 21, 2005, Quadrant entered into an informal settlement agreement with OSHA, agreeing to pay a penalty of $2,400 and to abate the violations. At the time, Quadrant did not inform Menasha about the citation or the settlement.

Meanwhile, Quadrant also had Cholin inspect the three other Poly Hi facilities. Cholin did so and submitted a report to Quadrant on September 13, 2005, in which he concluded that all four facilities failed to comply with NFPA standards. Quadrant prepared an abatement plan and obtained quotations for the cost of implementing Cholin's suggestions. Quadrant submitted a supplemental claim notice to Menasha dated December 29, 2005, informing Menasha of the dust issue and OSHA citation, by which time Quadrant had already spent over $200,000 on abatement. Over the next couple of years, at a cost of nearly $4,000,000, Quadrant implemented some of Cholin's suggestions—purchasing and modifying equipment, as well as modifying its facilities and housekeeping practices—to reduce dust emissions.

II

Quadrant sued Menasha in the District Court seeking indemnification for its remediation efforts. Menasha contended that it did not breach any warranty in the Agreement and, in any case, the reasonable cost of remediation did not exceed the $1,000,000 threshold in the Agreement. After a bench trial at which Cholin testified for Quadrant and Dr. Timothy Myers testified for Menasha, the District Court held that Quadrant had not established a violation of the general duty clause of the Act because

4

non-compliance with NFPA 654 was not a recognized hazard in the industry in 2005. The District Court also held that even had Menasha violated the Act, Quadrant was not entitled to indemnification because the reasonable cost of remediation did not exceed the $1,000,000 threshold.

## III

The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review questions of law, including questions of contract interpretation, *de novo*. *United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir. 2008). We review the District Court's factual findings, including its resolution of conflicting expert testimony, for clear error. *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1254 (3d Cir. 1993).

## IV

Our review of the record and the briefs leads us to conclude that, regardless of the merits of the dispute surrounding Menasha's alleged violation of the Act, the District Court committed no error when it held that Quadrant failed to prove that the reasonable cost of remediation would exceed $1,000,000.

At trial, the District Court heard testimony about the nature of the hazards at the Poly Hi facilities and the potential costs of remediation. The two experts, Cholin and Myers, presented different views on both issues. Cholin testified that a dust deflagration hazard existed if more than one percent of the dust particles had diameters below 420

5

microns, as measured in a sieve test. Myers testified that dust was combustible only if the average diameter of the dust particles was below 290 microns, and further specified that only dust with an average diameter below 120 microns fell into the NFPA's Class II Division 2, for which the NFPA called for the use of special electrical equipment. Myers tested a sample of dust particles smaller than 420 microns and they did not propagate an explosion. While Cholin testified that his recommended abatement plan—which was partially adopted and implemented by Quadrant—was necessary to bring the Poly Hi facilities into compliance with OSHA and the NFPA, Myers testified that less extensive measures, costing only $721,000, would do so.

The District Court credited the testimony of Myers over Cholin for two reasons. First, Myers's test showed that certain samples that met Cholin's criterion for a deflagration hazard would not cause an explosion. Second, the Court found Myers's testimony to be consistent with the NFPA and based on established methods of scientific analysis, whereas Cholin's methods had been neither peer-reviewed nor accepted by the scientific community. "Even where there are conflicting interpretations of data and other scientific information, a trial court's findings will not be overturned so long as the expert[] whose testimony was credited by the court 'provided a reasonable explanation of the scientific data.'" *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 263 (3d Cir. 2005) (quoting *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1216-18 (3d Cir. 1993)). Because we find that to be precisely the case here, it was not

6

clear error for the District Court to credit Myers's testimony over Cholin's.

Perhaps mindful of the foregoing, on appeal Quadrant does not directly attack the District Court's decision to credit Myers's testimony. Instead, Quadrant posits that because the Agreement defined "Losses" to include prejudgment interest and attorneys' fees, the District Court erred by concluding that the $1,000,000 indemnification threshold was not met because the reasonable remediation costs totaled $721,000. But the allowance of attorneys' fees under indemnification agreements typically is limited to the defense of the claim indemnified against and does not extend to costs incurred in establishing the right of indemnity. *See, e.g.*, *Cooper v. Loper*, 923 F.2d 1045, 1051 n.7 (3d Cir. 1991); *Simko v. C & C Marine Maint. Co.*, 594 F.2d 960, 969 (3d Cir. 1979).

Moreover, Quadrant did not present any evidence of prejudgment interest or the fees and costs it incurred pressing its claim. Rather, the parties entered into a pre-trial stipulation that Quadrant would present such evidence "if the Court rules in Quadrant's favor and awards Quadrant damages." Despite this stipulation, Quadrant now asks us to find that the District Court erred by failing to account for evidence and an argument never presented to it. "Absent compelling circumstances[,][we] will not consider issues that are raised for the first time on appeal." *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 219 (3d Cir. 1999) (citation omitted). Because the record is devoid of evidence of attorneys' fees or costs, it necessarily follows that the District Court could not have erred by failing to include such costs and fees in its damages calculation. Accordingly, the

7

District Court correctly held that, if Menasha had violated the Act, the $721,000 in reasonable remediation costs was the extent of the losses for which Quadrant could seek indemnification. And because that amount fell short of the $1,000,000 threshold, Menasha was not contractually obligated to pay anything.

V

For the foregoing reasons, we will affirm the judgment of the District Court.