**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1538
_____

P.R.B.A. CORP., t/a Bare Exposure,
Appellant

v.

HMS HOST TOLL ROADS, INC.;
THE SOUTH JERSEY TRANSPORTATION
AUTHORITY;
THE NEW JERSEY TURNPIKE AUTHORITY;
JOHN DOES #1-15
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 1-12-cv-07914
District Judge: The Honorable Renee M. Bumb
_____

Argued October 6, 2015

Before: FUENTES, SMITH, and NYGAARD,

*Circuit Judges*

(Opinion Filed: December 10, 2015)


F. Michael Daily, Jr.          **[ARGUED]**
216 Haddon Avenue
Suite 106
Westmont, NJ  08108
          *Counsel for Appellant*


Catherine A. Bledsoe          **[ARGUED]**
Gordon Feinblatt
233 East Redwood Street
Baltimore, MD  21202

          *Counsel for Appellees*


————————————

OPINION

————————————


SMITH, *Circuit Judge.*

This case requires us to determine whether a private company that operates service plazas on New Jersey highways acted "under color of any statute, ordinance, regulation, custom, or usage, of any State," 42

U.S.C. § 1983, when it removed brochures belonging to a "gentleman's club" from the common areas of its service plazas. We hold that it did not. The absence of any direct involvement by the state authorities either in the decision to remove the brochures or in the general, day-to-day operations of the service plazas compels this conclusion. Accordingly, we will affirm the District Court's grant of summary judgment.

## I.

P.R.B.A. Corporation (t/a "Bare Exposure") is a New Jersey corporation that operates a "gentleman's club" in Atlantic City, New Jersey, billing itself as "Atlantic City's Only All Nude Entertainment." HMS Host Toll Roads, also a private corporation, leases service plazas located along the Garden State Parkway and the Atlantic City Expressway from the South Jersey Transportation Authority and the New Jersey Turnpike Authority (together referred to as the "Authorities"). Host operates restaurants, gift shops, and convenience stores in the service plazas it leases from the Authorities. The leases also state that Host must pay the Authorities the higher of either a percentage of its gross sales or a fixed rental payment each month. The parties agree, however, that the Authorities are not involved in any of Host's day-to-day operations or overall management of the service plazas. Under the leases, the Authorities' only direct responsibility is to perform long-term

3

maintenance to parking areas, exteriors of the buildings, and building lobbies.

In 2003, Host entered into a contract with CTM Media Group, Inc. which permitted CTM to install and service CTM-owned brochure display racks in the lobbies of the service plazas. CTM pays Host the greater of a minimum monthly payment or 40% of the gross revenue generated by the brochure racks. The contract also provides that Host "must approve all brochures or publications of any kind" prior to placement in the racks. The Authorities were not a party to this contract.

In 2012, Kevin Diamond, a Host employee, discovered a Bare Exposure brochure in one of the CTM display racks located in a Host service plaza. Diamond sent a copy of the brochure to Greg Dion, Host's General Manager of New Jersey Motorway Operations. Dion contacted CTM and instructed its representative to remove all Bare Exposure brochures from Host's service plazas. The parties agree that Mr. Dion's decision to have the brochures removed was his and his alone; he did not consult with or receive any direction from the Authorities. Nor did he review or consider any provisions of the New Jersey Administrative Code prior to making his decision. Instead, he believed that he was exercising Host's right under the CTM Agreement to approve all brochures placed in the racks.

There is also no evidence that the Authorities ever directed Host employees to take any actions regarding the placement of brochures in the plazas. Further, the leases between Host and the Authorities are silent with respect to the placement of brochures and other marketing materials in the lobbies of the service plazas. That said, Bare Exposure contends that the Authorities placed several government signs and photographs in service plaza lobbies. These include photos of the current Governor of New Jersey, a photo of the late Senator Farley in the common area of one plaza, and a government information booth in the common area of another. It is undisputed, however, that no representative of the Authorities ever instructed Host to remove a brochure or advertisement from the lobby of a service plaza along the Garden State Parkway or Atlantic City Expressway.

## II.

After learning of the brochures' removal, Bare Exposure filed suit under 42 U.S.C. § 1983 alleging that Host's actions violated Bare Exposure's First and Fourteenth Amendment rights. This case comes to us on a timely appeal from the District Court's February 6, 2015, order granting Host's motion for summary judgment. This Court has jurisdiction under 28 U.S.C. § 1291 to review the District Court's ruling on Bare Exposure's § 1983 claim. *Lassiter v. City of Phila.*, 716 F.3d 53, 55 n.1 (3d Cir. 2013).

It is well established that we employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court. *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995). In considering an order entered on a motion for summary judgment, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Id.*

## III.

While Bare Exposure's appellate brief attempted to present two arguments as to why it believed this Court should find state action, at oral argument counsel clarified that Bare Exposure was actually limiting its appeal to a single argument. Specifically, counsel argued only that Host is a state actor under the entwinement test.[1] We confine our analysis accordingly.[2]

---

[1] Indeed, had Bare Exposure not conceded this point, the Court would have similarly limited the scope of review because Bare Exposure explicitly confined itself to this argument when opposing Host's motion for summary judgment in the District Court. Pl.'s Br. in Opp. to S.J. at 1. *See Shell Petroleum, Inc. v. United States,* 182 F.3d 212, 218 (3d Cir. 1999) ("[A litigant] must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits."); *Liberles v. Cook Cnty.,* 709 F.2d 1122, 1126 (7th Cir.

We next turn to the merits of Bare Exposure's state action argument. The touchstone for our analysis of all state action claims is *Brentwood v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). In *Brentwood*, the Supreme Court held that "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that

---

1983) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.").

[2] We also note that Bare Exposure's initial attempt to rely on the Supreme Court's decision in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), which has been credited with creating the symbiotic relationship test, is of no merit even if this argument were not waived. As this Court clarified in *Crissman v. Dover Downs Entm't Inc.*, "while *Burton* remains good law, it was crafted for the unique set of facts presented, and we will not expand its reach beyond facts that replicate [it]." 289 F.3d 231, 242-44, (3d Cir. 2002) (en banc). This case does not present such facts. Bare Exposure does not claim that Host's removal of the brochures was necessary for the continued financial viability of either the Authorities or Host—one finding (among many others) necessary to replicate the factual scenario present in *Burton*.

7

of the State itself." *Id.* at 295; *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) ("The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights *fairly attributable* to the State?") (emphasis added).

The *Brentwood* Court also gave additional structure to several tests that lower courts had previously been using to determine whether a private party satisfied the "close nexus" requirement necessary to be considered a state actor. One of these tests is called the "entwinement test," which asks whether "[t]he nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and [thus] there is no substantial reason to claim unfairness in applying constitutional standards to it." *Brentwood*, 531 U.S. at 298.

The Supreme Court also applied this test in *Brentwood* when it held that a non-profit athletic association which regulated interscholastic sports among Tennessee public and private high schools was a state actor. In so doing, the Court focused on the top-to-bottom intermingling of association leaders and public school officials: "[t]here would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly

8

perform all but the purely ministerial acts by which the Association exists and functions in practical terms." *Id*. at 300. Indeed, "[o]nly the 16% minority of private school memberships prevents this entwinement of the Association and the public school system from being total and their identities totally indistinguishable." *Id*. This case thus shows that the entwinement test focuses on the overlap or merger of public and private entities as a result of their shared leadership or other attributes that make it hard to separate their public functions from their private ones.

Two additional cases help further flesh out the contours of this test. First, in *Gannett Satellite Information Network, Inc. v. Berger*, this Court concluded that the concessionaires that leased property in the Newark Airport and decided not to distribute certain newspapers were simply "private entities pursuing private ends" because there was no "explicit governmental involvement" in the decisions of the concessionaires and thus their conduct "may not fairly be attributed to the Port Authority." 894 F.2d 61, 67 (3d Cir. 1990). The *Gannett* Court also went on to note that, "[a]bsent any explicit governmental involvement in the *distribution decisions* of these private newsstands, the actions taken by the concessionaires in this case may not fairly be attributed to the Port Authority." *Id*. at 67 (emphasis added). *Gannett* thus makes clear that our analysis should also focus on evidence of explicit

9

involvement of the governmental authority in the *specific action* the plaintiffs challenge. In *Gannett*, it was the decision not to sell certain newspapers. Here, it was the removal of Bare Exposure's brochures.

Second, in *Marie v. American Red Cross*, the Sixth Circuit further elaborated on the high bar necessary for a finding of impermissible entwinement. 771 F.3d 344 (6th Cir. 2014). In this case, even the close working relationship between several state agencies and the Red Cross was not sufficient to constitute entwinement. The Sixth Circuit reiterated that "mere cooperation simply does not rise to the level of merger required for a finding of state action." *Id.* at 364. Instead, there must be "*pervasive* entwinement of public institutions and public officials in [the private entity's] composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it." *Id*. (emphasis added).

All these cases show that we must carefully analyze the entire record to determine whether the Authorities were so *pervasively entwined* in the structure and management of Host that Host should fairly be treated as a government entity under the Constitution.

The record in this case does not suggest any pervasive entwinement. There was no personnel overlap between the Authorities and Host, and no specific involvement of the Authorities in Host's decision to

10

remove the brochures. Bare Exposure's strongest argument is the presence of a provision in the service plaza leases that requires Host, in certain situations, to pay a varying percentage of its gross sales income to the Authorities instead of a fixed amount. There is no indication, however, that this profit sharing led to any actual involvement of either entity in the management or control of the other. Thus, without more, this financial remuneration for the leasehold fails to provide any indication of the "pervasive entwinement" required under *Brentwood*.

We also hold that the presence of government signs and images of state officials in the service plazas—without more—does not constitute entwinement. Even assuming that the Authorities *required* Host to place these signs and images in the common areas, this fact still does not suggest actual entwinement, let alone "pervasive entwinement" as required by *Brentwood*. Without any showing of the involvement of the Authorities in the operations of Host, this can at best be viewed as an additional requirement placed on Host as a condition of its continued leasing of the service plazas. This type of detailed control or regulation, however, is not a form of entwinement. *See Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 243 (3d Cir. 2002) (en banc) ("[T]he Court has repeatedly opined that regulation—even detailed regulation, as we have here—does not equate to state action.").

11

The same can be said of Bare Exposure's allegation that the Authorities' signs and photographs create the perception that the service plazas are run by the state. Even assuming this to be true, the mere perception of governmental control is insufficient for finding state action under the entwinement test. *See S. F. Arts & Athletics, Inc. v. U. S. Olympic Comm.*, 483 U.S. 522, 546 n.27 (1987) (noting that, "absent the additional element of governmental control," the mere *representation* of the United States in the Olympics by the USOC is not sufficient for a finding of state action).

## IV.

For the reasons above, we conclude that the District Court appropriately granted summary judgment in favor of Host. Accordingly, we will AFFIRM.