ROTH, Circuit Judge, dissenting.
 

 Appellant Spiridon Spireas's entitlement to the long-term capital gains tax rate under I.R.C. § 1235 depends upon his contention that the 1998 Agreement transferred to Mutual all substantial rights to future drug formulations, agreed upon by Spireas and Mutual, including the felodipine formulation. Concluding that Spireas failed to advance this argument before the Tax Court, the Majority finds Spireas's appeal barred by the waiver doctrine. In reaching that conclusion, the Majority misconstrues Spireas's arguments before the Tax Court and misapplies our waiver precedent. Accordingly, I respectfully dissent.
 

 I.
 

 I turn first to the issue of consistency. The Majority sees inconsistency between Spireas's argument in the Tax Court and his argument on appeal. According to the Majority, Spireas changed the date on which he granted Mutual the rights to liquisolid felodipine. But a more careful examination of the record reveals that,
 both at trial and before this Court, Spireas has advanced essentially the same argument regarding the transfer of rights-an argument that relies on both the 1998 Agreement and the March 2000 Engagement Letter, operating in conjunction to convey future rights to liquisolid felodipine. On appeal, Spireas chose to "place greater emphasis"
 
 [1]
 
 on the 1998 Agreement. The fact that Spireas did so in order to counter what he considered to be the erroneous reasoning of the Tax Court, does not provide a basis for the Majority to contend now that Spireas has changed his position. In fact, he has merely changed the emphasis. We will demonstrate that below.
 

 Spireas's written submissions to the Tax Court consistently reflect his argument that the 1998 Agreement and the March 2000 Engagement Letter are "of a piece [and] related parts of the contracting parties' consistent course of dealing."
 
 [2]
 
 The purpose of the 1998 Agreement was for Spireas to grant to Mutual a license to use the liquisolid technology in connection with specific products that Spireas and Mutual would agree to develop.
 
 [3]
 
 This was accomplished in the 1998 Agreement. Under it, Spireas did not transfer "all substantial rights" to the liquisolid technology itself but he did convey, as provided in ¶¶ 2.2 and 5.1, "all substantial rights" to the patentable formulation of the liquisolid version of felodipine, as provided in the March 2000 Engagement letter.
 

 This interpretation was corroborated at the outset of the litigation when Spireas and the IRS jointly addressed the relationship between the 1998 Agreement and the March 2000 Engagement Letter in the First Stipulation of Facts (Stipulation). The Stipulation explicitly acknowledges the interdependence of the 1998 Agreement and the March 2000 Engagement Letter, stating, "The 1998 License Agreement governed the relationship and rights of the parties but, pursuant to ¶¶ 2.2 and 5.1 of that agreement, the parties entered into specific agreements each time they agreed to develop a new liquisolid pharmaceutical product."
 
 [4]
 
 As this language reflects, both Spireas and the IRS agreed that the 1998 Agreement governed the
 
 rights
 
 of the parties, including the rights transferred for each product which they subsequently agreed to develop. In addition, they explicitly acknowledged that the March 2000 Engagement Letter was entered into
 
 pursuant to
 
 the 1998 Agreement-specifically Section 2.2, which governs the conditions of Mutual's "exclusive right to Produce and Sell ... Products,"
 
 [5]
 
 such as felodipine. Thus, from the outset, both Spireas and the IRS recognized that the transfer of rights to drug "Products," such as felodipine, depended upon the terms of the 1998 Agreement.
 

 Spireas's post-trial briefs continue to emphasize the importance of the 1998 Agreement and the interdependence between the 1998 Agreement and the March 2000 Engagement Letter. In his opening post-trial brief, Spireas described the March 2000 Engagement Letter as a "formal agreement ... to identify generic felodipine as a potential
 
 product
 
 to develop pursuant to the 1998 License Agreement ...."
 
 [6]
 
 He proceeded to explain, "The March 2000 [Engagement Letter] applied
 the terms of the 1998 License Agreement to the felodipine product. ... The parties treated the transfer of the felodipine technology after it was invented as an exclusive transfer under Section 2.1 of the 1998 License Agreement."
 
 [7]
 
 These statements to the Tax Court align with Spireas's argument on appeal that the 1998 Agreement effected a legal transfer of rights to the future Products and that the March 2000 Engagement Letter identified the felodipine formulation as one of the Products to which future rights had been transferred.
 

 Spireas also explicitly relied on the 1998 Agreement when discussing the royalty payments in the Tax Court. He argued throughout his opening post-trial brief that the royalty payments were made in exchange for rights to the felodipine technology and that the payments were made pursuant to Section 4 of the 1998 Agreement. He argued, "The parties treated the transfer of the felodipine technology as subject to royalties under Section 4.1 of the 1998 License Agreement."
 
 [8]
 
 Spireas reemphasized this point throughout the brief, later noting, "URL/Mutual paid royalties to Dr. Spireas consistent with Section 4.1 of the 1998 License Agreement."
 
 [9]
 

 Spireas continued to emphasize the importance of the 1998 Agreement in his answering brief. Responding to the IRS's arguments, Spireas emphasized that he "could (and did) transfer all of his significant rights in the felodipine ... technologies to URL/Mutual under the terms of the [1998] Agreement."
 
 [10]
 
 Spireas also contended that the IRS misunderstood "how the terms of the 1998 Agreement applied to the actual technology transfers at issue."
 
 [11]
 

 As the record demonstrates, in his written submissions to the Tax Court, Spireas focused on many of the same provisions of the 1998 Agreement that he later emphasized in his initial brief on appeal. Both his trial and appellate briefs devote particular attention to Section 2, which transfers rights to future Products; Section 4, which provides for a 20% royalty based on the sale of those Products; and Section 5, which sets forth the process by which future drug formulations will be selected as Products under the Agreement. Spireas's consistent emphasis on the same contractual provisions distinguishes his case from cases in which we have found waiver. For instance, in
 
 Frank v. Colt Industries, Inc.
 
 , we concluded that a finding of waiver was appropriate because appellant's new theory relied upon a separate provision of the contract that was not at issue before the trial court.
 
 [12]
 
 That is the opposite of the situation here. Spireas has relied on the same provisions of the 1998 Agreement throughout the litigation, and he has made a consistent argument about the interdependence of the 1998 Agreement and the March 2000 Engagement Letter.
 

 The Majority's position rests upon two misunderstandings. First, the Majority confuses the legal transfer of
 
 rights
 
 to the felodipine formulation (and other Products) with the physical transfer (
 
 i.e.
 
 , the handover or disclosure) of the felodipine formulation. Second, the Majority incorrectly concludes that, as a matter of law, Spireas could not have transferred rights to the liquisolid felodipine formulation until it was reduced to practice.
 

 The Majority's confusion on the first point is understandable, since Spireas's trial counsel did not make the distinction as clear as she could have. In fact, at the close of trial, counsel was tripped up by this distinction herself. Seeking to shift the burden of proof, counsel initially asserted, "Dr. Spireas transferred the felodipine and propafenone technologies to United and Mutual at some point after that March 7th, 2000 agreement."
 
 [13]
 
 The Tax Court judge responded that the issue of transfer was not a question of fact. Recognizing the confusion her statement had caused, Spireas's trial counsel immediately clarified, "Dr. Spireas gave the formulation technologies, the specific technologies,
 
 handed those over
 
 to [,] the felodipine and propafenone technologies[,] to United and Mutual at some point after March 7th, 2000.
 
 So the completed formulas
 
 ."
 
 [14]
 

 This clarification actually underscored the distinction being made. The
 
 rights
 
 to the future drug formulations were transferred in exchange for royalty payments. That transfer of rights occurred via legal instrument-in this case, the 1998 Agreement, which granted rights to future Products in exchange for 20% royalty payments, operating in conjunction with the March 2000 Engagement Letter, which identified the felodipine formulation as a Product under the 1998 Agreement. The
 
 actual felodipine formulation
 
 was physically transferred or handed over to Mutual later, at least several months after March 2000, once Spireas had completed its development.
 
 [15]
 

 Once this distinction is recognized, the purported inconsistency in Spireas's argument disappears. The Majority finds that Spireas "could hardly have been more explicit that he 'did not transfer the felodipine technology in 1998."
 
 [16]
 
 But the Majority mistakes this statement about the physical transfer of the felodipine formulation for a statement about the role of the 1998 Agreement in the legal transfer of rights to the formulation. The transfer of legal rights-not the disclosure of the formulation itself-served as consideration for Mutual's royalty payments.
 
 [17]
 
 And the language immediately following Spireas's statement in his post-trial brief that he "did not transfer the felodipine technology in 1998" clarifies Spireas's position that the
 
 rights
 
 to that technology were transferred via the 1998 Agreement and the March 2000 Engagement Letter.
 
 [18]
 
 That is consistent with Spireas's argument on appeal.
 

 Undoubtedly, Spireas's trial counsel could have used more precise language to distinguish between the legal transfer of rights and the physical transfer of the formulation. But, under this Court's precedents, that mistake alone provides an insufficient basis to find that Spireas has waived his argument on appeal.
 
 [19]
 
 Here,
 Spireas presented a complicated but consistent argument throughout his written submissions. That is not the same as failing to present an argument entirely or presenting an argument only briefly or in passing. His statements regarding the legal transfer of rights to the felodipine formulation via the 1998 Agreement and March 2000 Engagement Letter were sufficiently consistent to preserve his argument on appeal.
 

 Responding to these arguments, the Majority contends that this dissent focuses on the question of
 
 which
 
 instruments transferred the rights to liquisolid felodipine, at the exclusion of considering
 
 when
 
 the transfer took place.
 
 [20]
 
 This is a false distinction. All parties to this appeal agree that there are, at most, two possible "instruments of transfer"
 
 [21]
 
 -the 1998 Agreement and the March 2000 Engagement Letter-and the Tax Court record reflects a consistent focus on these documents. There were no other instruments governing the transfer of rights. If, as the Majority contends, Spireas's argument below depended solely upon a post-March 2000 transfer of
 
 rights
 
 , then the extensive discussion of the 1998 Agreement and March 2000 Engagement Letter in Spireas's briefs
 
 [22]
 
 and trial testimony
 
 [23]
 
 would be incongruous.
 

 The Majority opinion also incorrectly concludes that an inventor cannot avail himself of § 1235 if he has not reduced an invention to practice before transferring the rights to that invention.
 
 [24]
 
 As a result, the Majority's approach forecloses reliance on the 1998 Agreement. But the law is not as absolute as the Majority opinion would lead us to believe. Although it may be the "general rule" that "an invention must have been actually reduced to practice at the time of the sale,"
 
 [25]
 
 in order for the seller to receive favorable tax treatment under § 1235, it is equally true that transfers of future inventions are valid
 
 [26]
 
 and that "parties can agree in advance that upon reduction to practice the inventor will convey the property to the purchaser."
 
 [27]
 
 In these situations, a seller may be entitled to the benefit of § 1235, particularly where, as here, the future inventions are improvements on an existing invention.
 
 [28]
 

 Moreover, the Majority's position not only precludes reliance on the 1998 Agreement, it would also seem to have us throw out the March 2000 Engagement Letter, as that agreement similarly predates the felodipine formulation's reduction to practice. By the Majority's own account, the felodipine formulation was not reduced to practice until May 2000 at the earliest.
 
 [29]
 
 The Majority erroneously concluded that "Spireas's original theory hinged on a post-invention transfer of rights" that occurred at some point after May 2000.
 
 [30]
 
 This conclusion reinforces the Majority's misunderstanding of the distinction between the physical transfer of the completed formulation and the transfer of rights. Moreover, it is difficult to reconcile with the extensive discussion of both the 1998 Agreement and the March 2000 Engagement Letter in Spireas's Tax Court briefs.
 

 It is clear that Spireas's position before the Tax Court was consistent with his position here. When looked at closely, Spireas has waived nothing because he presented the full facts and legal argument to the Tax Court. The Tax Court erred in its interpretation of what was presented. Spireas has brought the same facts and the same legal argument before us. In view of his consistent position, I would reverse the opinion of the Tax Court and remand this case with instructions to grant Spireas long-term capital gains treatment of the royalty payments in question.
 

 II.
 

 In light of the above, I submit that consideration of the issue of waiver is not necessary. However, the Majority depends on waiver, and I believe it is helpful to review the errors of the Majority's position on waiver.
 

 "[T]he crucial question regarding waiver is whether [the party] presented the argument with sufficient specificity to alert the [trial] court."
 
 [31]
 
 Although the case law does not prescribe a specific list of factors to consider in evaluating waiver, an assessment of waiver must be grounded in the prudential origins of the doctrine. The guiding principle is that parties should have a chance to present all relevant evidence at trial and should "not be surprised on appeal by ... issues upon which they have had no opportunity to introduce evidence."
 
 [32]
 
 The waiver doctrine is most strictly applied where a party's failure to timely raise the issue below has resulted in an incomplete factual record on appeal.
 
 [33]
 
 In contrast, "we are less inclined to find a waiver when the parties have had the opportunity to offer all the relevant evidence and when they are not surprised by issues on appeal,"
 
 [34]
 
 and we are "reluctant to apply the waiver doctrine when only an issue of law is raised."
 
 [35]
 

 Courts of appeals may exercise discretion in considering issues or arguments not
 directly raised below.
 
 [36]
 
 Ordinarily, "[f]or an issue to be preserved for appeal, a party 'must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits.' "
 
 [37]
 
 Waiver is not an absolute bar, however, and must be considered on a case-by-case basis. Even when an issue or argument is otherwise waived, exceptions may apply.
 
 [38]
 

 Our decisions in this area
 
 [39]
 
 reflect the sliding scale that we have applied to questions of waiver. They reinforce the discretion that has always been a part of our waiver analysis in civil cases. Each of our waiver decisions is grounded in the prudential considerations underlying the doctrine: that parties have an opportunity to present all relevant evidence at trial and develop a complete factual record, and that the parties not be surprised by new issues on appeal.
 

 The Majority, much like the Commissioner, rests its analysis almost entirely on
 
 United States v. Joseph
 
 ,
 
 [40]
 
 a case it characterizes as "our seminal precedent" on waiver.
 
 [41]
 

 Joseph
 
 was a
 
 criminal
 
 case, and the question of waiver arose in the narrow context of a motion to suppress evidence, pursuant to Federal Rule of Criminal Procedure 12.
 
 [42]
 
 As such, the
 
 Joseph
 
 majority expressly noted that it "d[id] not have occasion to consider whether the framework explained here applies in other waiver contexts, such as ... waiver in civil cases."
 
 [43]
 
 Thus, although
 
 Joseph
 
 remains instructive, particularly with regard to the distinction between issues and arguments, it does not and cannot undermine our prior precedent that civil waiver is a prudential doctrine to be applied in a case-specific manner. Both the majority opinion in
 
 Joseph
 
 itself
 
 [44]
 
 and subsequent decisions applying
 
 Joseph
 
 in the civil context reflect this reality.
 
 [45]
 
 Yet the Majority relies on
 
 Joseph
 
 at the exclusion of our precedent on civil waiver.
 

 As noted, waiver is a prudential doctrine, not an absolute rule. Its purpose is to provide parties "an opportunity to offer all evidence they believe relevant to the issues" and ensure "that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence."
 
 [46]
 
 These justifications inform our approach to the waiver doctrine and explain the flexible approach we have taken across various decisions.
 
 [47]
 
 In cases that do not present the particular problems the waiver doctrine protects against, we are less likely find that an issue has been waived.
 
 [48]
 
 This is such a case.
 

 The evidentiary record in this case is fully developed. The relevant documents-primarily the 1998 Agreement and the March 2000 Engagement Letter-have been available to all parties from the outset of this litigation. On appeal, neither Spireas, nor the IRS in response, rely on any evidence not presented to the Tax Court. The substantive question of whether the 1998 Agreement effected a transfer of future rights to Products can be resolved fully based on the current record.
 

 In addition, the IRS cannot credibly claim to be "surprised" by any of the issues presented on appeal. As Section I demonstrates, Spireas's position regarding the 1998 Agreement was apparent throughout his written submissions to the Tax Court. Furthermore, the Tax Court actually decided the question of what agreement served as the instrument of transfer.
 
 [49]
 
 The Tax Court's ruling certainly gave the IRS sufficient notice that the issue might be raised on appeal.
 

 This case presents none of the core problems that the waiver doctrine is designed to protect against. The relevant issues can be decided based on the available record without prejudice to either party. Thus, Spireas has preserved his current argument, and the circumstances of this case weigh against applying the waiver doctrine strictly and in favor of deciding this appeal on the merits.
 

 III.
 

 For the above reasons, I conclude that the Majority has misinterpreted the facts of record and has erred in concluding that Spireas waived his argument on appeal. I therefore respectfully dissent. The Majority, having found Spireas's argument waived, does not reach the merits of this appeal. Were we to reach the merits, I would conclude that Spireas is entitled to long-term capital gains rate under I.R.C. § 1235 because he received the royalty payments in exchange for all substantial
 rights to the liquisolid felodipine formulation.
 

 See
 

 Gen. Refractories Co. v. First State Ins. Co.
 
 ,
 
 855 F.3d 152
 
 , 162 (3d Cir. 2017).
 

 Reply Br. at 3.
 

 App. at 8 (T.C. Op.).
 

 App. at 57.
 

 App. at 69.
 

 Appellee's Supp. App. at 7 (emphasis added).
 

 Appellee's Supp. App. at 7-8.
 

 Appellee's Supp. App. at 9.
 

 Appellee's Supp. App. at 13.
 

 Appellants' Supp. App. at 27.
 

 Appellants' Supp. App. at 28.
 

 910 F.2d 90
 
 , 99-100 (3d Cir. 1990).
 

 2 T.C. Rec. 174.
 

 2 T.C. Rec. 175 (emphasis added).
 

 See
 
 Reply Br. at 8-9.
 

 Maj. Op. at 320-21 (quoting 2 T.C. Rec. 322).
 

 Under any licensing agreement for a patentable product, payments are inherently made for the rights to make and sell the product, not for the product itself. Section 1235 reflects this reality, as it addresses payments made in consideration for a transfer of "all substantial
 
 rights
 
 to a patent." I.R.C. § 1235 (emphasis added).
 

 2 T.C. Rec. 322 ("The March 2000 Letter Agreement applied the terms of the 1998 License Agreement to the felodipine product.").
 

 For example, in
 
 Keenan v. City of Philadelphia
 
 , a case in which we stated that "the crucial question regarding waiver is whether [a party] presented the argument with sufficient specificity to alert the district court," we nonetheless based our finding of waiver on the fact that the argument presented by the defendants on appeal appeared "[n]owhere in their submissions to the district court (or to this court before oral argument)."
 
 983 F.2d 459
 
 , 471 (3d Cir. 1992). In a similar vein, in
 
 In re Insurance Brokerage Antitrust Litigation
 
 , we noted that arguments "properly preserved for appeal are limited to those ... presented with at least a minimum level of thoroughness to the District Court," even if they were presented in a "conclusory fashion."
 
 579 F.3d 241
 
 , 262 (3d Cir. 2009).
 

 Maj. Op. at 320-21.
 

 Cf
 
 .
 
 26 C.F.R. § 1.1235-2
 
 (b).
 

 See supra
 
 notes 8-11 and accompanying text.
 

 See e.g.
 
 , 2 T.C. Rec. 77 (trial testimony of Spiridon Spireas) (describing the March 2000 Engagement Letter as "the agreement ... to transfer to Mutual those specific three products at the time to be worked and developed based on some technologies that were available at the time.").
 

 See
 
 Maj. Op. at 322-23.
 

 William H. Byrnes & Marvin Petry, Taxation of Intellectual Property and Technology § 6.05[3][b] (2017).
 

 Id
 
 . § 6.05[4] (citing
 
 Dreymann v. Comm'r of Internal Revenue
 
 ,
 
 11 T.C. 153
 
 (1948) ).
 

 Id
 
 . § 6.05[3][a].
 
 See also
 

 New Britain Mach. Co. v. Yeo
 
 ,
 
 358 F.2d 397
 
 , 405 (6th Cir. 1966) (discussing construction of contracts assigning future inventions and improvements).
 

 Id
 
 . § 6.05[4]. For purposes of patent law, the liquisolid felodipine formulation was an "improvement" of the general liquisolid technique.
 
 See
 

 35 U.S.C. § 101
 
 . All parties acknowledge that Spireas conveyed limited rights to the general liquisolid technique via the 1998 Agreement.
 

 Maj. Op. at 323-24.
 

 Id
 
 .
 

 Keenan
 
 ,
 
 983 F.2d at 471
 
 .
 

 Hormel v. Helvering
 
 ,
 
 312 U.S. 552
 
 , 556,
 
 61 S.Ct. 719
 
 ,
 
 85 L.Ed. 1037
 
 (1941).
 

 Shell Petroleum, Inc. v. United States
 
 ,
 
 182 F.3d 212
 
 , 219 (3d Cir. 1999) (" 'This general rule applies with added force where the timely raising of the issue would have permitted the parties to develop a factual record,' because we cannot know on appeal what evidence the adverse party would have presented or brought out through cross-examination." (quoting
 
 Harris v. City of Phila.
 
 ,
 
 35 F.3d 840
 
 , 845 (3d Cir. 1994) ) ).
 

 Huber v. Taylor
 
 ,
 
 469 F.3d 67
 
 , 75 (3d Cir. 2006).
 

 Id
 
 . at 74.
 

 See, e.g.
 
 ,
 
 Singleton v. Wulff
 
 ,
 
 428 U.S. 106
 
 , 121,
 
 96 S.Ct. 2868
 
 ,
 
 49 L.Ed.2d 826
 
 (1976) ;
 
 Bagot v. Ashcroft
 
 ,
 
 398 F.3d 252
 
 , 256 (3d Cir. 2005).
 

 In re Ins. Brokerage Antitrust Litig.
 
 ,
 
 579 F.3d at 262
 
 (quoting
 
 Shell Petroleum, Inc.
 
 ,
 
 182 F.3d at
 
 218 ).
 

 Hormel
 
 ,
 
 312 U.S. at 557
 
 ,
 
 61 S.Ct. 719
 
 ("There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.");
 
 Huber
 
 ,
 
 469 F.3d at 74
 
 ("[E]ven if an issue was not raised, '[t]his Court has discretionary power to address issues that have been waived.' " (quoting
 
 Bagot
 
 ,
 
 398 F.3d at
 
 256 ) ).
 

 See e.g.
 
 ,
 
 Huber
 

 469 F.3d at 75-76
 
 (emphasizing the "prophylactic and prudential origins of the [waiver] doctrine" and holding that a purely legal argument could and should be considered on appeal, even if it had been waived);
 
 In re Insurance Brokerage Antitrust Litig.
 
 ,
 
 579 F.3d at 262
 
 (holding the waiver doctrine did not bar consideration on appeal of arguments presented to the District Court in a "conclusory fashion");
 
 Frank
 
 ,
 
 910 F.2d at 99
 
 (holding an argument to have been waived where its presentation on appeal would "raise important issues of first impression ... as well as difficult questions of fact").
 

 730 F.3d 336
 
 (3d Cir. 2013).
 

 Maj. Op. at 321-22.
 

 See
 

 Joseph
 
 ,
 
 730 F.3d at 338
 
 .
 

 Id
 
 . at 339 n.3
 

 Id
 
 . (citing
 
 Huber
 
 ,
 
 469 F.3d at
 
 74-75 ).
 

 See, e.g.
 
 ,
 
 Gen. Refractories Co.
 
 , 855 F.3d at 162 (discussing the waiver standard in
 
 Joseph
 
 and concluding that "even if [Appellant's] argument had not been placed before the District Court, we would nevertheless consider it in reaching our conclusion"). The Majority opinion relies on
 
 In re J&S Properties, LLC
 
 ,
 
 872 F.3d 138
 
 , 146 (3d Cir. 2017), for the proposition that
 
 Joseph
 
 applies to civil cases.
 
 J&SProperties
 
 includes only a brief discussion of waiver and a single citation to
 
 Joseph
 
 , with no substantive analysis of the case or its applicability in the civil context. Other recent cases, such as
 
 General Refractories
 
 , make clear that
 
 Joseph
 
 may be instructive in the civil context but does not alter the prudential and fact-specific nature of the civil waiver doctrine.
 

 Hormel
 
 ,
 
 312 U.S. at 556
 
 ,
 
 61 S.Ct. 719
 
 .
 

 See
 

 Huber
 
 ,
 
 469 F.3d at 74-75
 
 .
 

 Id
 
 . at 75.
 

 See
 
 App. at 25-34 (T.C. Op.). The Tax Court, unfortunately, misstated Spireas's position on this issue by relying almost exclusively on the testimony of George Gould.
 
 See
 

 Id
 
 . at 29-30 & n.6 (treating Gould's testimony as Spireas's position regarding the 1998 Agreement and March 2000 Engagement Letter). Spireas's post-trial briefs, however, include no mention of the alternative theory Gould concocted at trial and cite almost exclusively to Gould's expert report rather than his trial testimony.
 
 See
 

 2 T.C. 307
 
 -44 (Spireas's Post-trial Opening Brief);
 
 2 T.C. 366
 
 -422 (Spireas's Post-trial Answering Brief).